UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| MADISON TOOL AND DIE, INC., | ) |
| Plaintiff, | ) ) ) |
| vs. | ) 4:06-cv-74-JDT-WGH ) ) |
| ZF SACHS AUTOMOTIVE OF AMERICA, INC., | ) ) ) |
| Defendant. | ) ) |

**Memorandum of Decision**[1]

This case involves a dispute between Madison Tool and Die, Inc. and ZF Sachs Automotive of America, Inc. A bench trial was held in New Albany, Indiana, on December 5th and 6th, 2007. Many of the facts were stipulated by the parties, and the court has considered the pleadings, the live and deposition testimony, the exhibits submitted at trial, and the arguments of counsel. Pursuant to Federal Rule of Civil Procedure 52(a)(1), the court makes the following Findings of Fact and Conclusions of Law.[2]

---

[1] This Entry is a matter of public record and will be made available on the court's web site. However, the discussion contained herein is not sufficiently novel to justify commercial publication.

[2] Any factual finding more properly considered a conclusion of law and any conclusion of law more properly considered a factual finding are so deemed. Any factual finding and any conclusion of law more properly considered a mixed question of fact and law are also so deemed.

**Findings of Fact**

1. Plaintiff Madison Tool and Die, Inc. ("Madison"), is an Indiana corporation with its principal place of business in Madison, Indiana. It was formed in 1958 as a tool and die shop. Jim, Gary, and Terry Sparks purchased Madison in 1975.

2. Terry Sparks is Madison's president. All of Madison's employees report either directly or indirectly to him.

3. Madison has four divisions. The division involved in this case is the Screw Machine Division. The manager of Madison's Screw Machine Division is Glenn Rogers.

4. The primary customers of Madison's Screw Machine Division are original equipment manufacturer ("OEM") automotive customers. Madison makes parts that are incorporated into larger assemblies – assemblies such as seats, brake assemblies, fasteners, and door panels – that are eventually incorporated into a vehicle.

5. Madison obtains customers in several ways, one of which is through its sales force. In 2001, Madison had a sales force that included one employee and a few independent or outside sales representatives. One of those sales representatives was Celeste Reed, a resident of Madison, Indiana.

6. Until she retired, Celeste Reed spent her professional career as a sales representative for several companies.

7. In 2001, Reed owned C.R. Reed, Inc., which operated as an industrial sales and marketing company. In her role as an independent sales agent, Reed matched potential customers with industrial companies that she represented or at which she had contacts.

8. Defendant ZF Sachs Automotive of America, Inc. ("Sachs") is a New York corporation with its principal place of business in Northville, Michigan. The Sachs plant at issue in this case is located in Florence, Kentucky. That plant is a producer and supplier of shocks and struts to the automotive industry. Sachs makes several different kinds of shocks; the particular model at issue in this case is a Nivomat shock.

9. The "piston nut" is a component of the Nivomat shock.

10. As Sachs engineer Holger Kirchner explained, burrs (raised material) are a particular concern with the piston nut. Any burrs on a piston nut could potentially break off, traveling away from the piston nut, ultimately causing any number of problems in a Nivomat shock. This can lead to failure of the part, affecting both comfort and safety.

11. In order to detect the burrs, an eye loop, or magnifying glass, may be necessary.

12. In February 2001, Bruce Jones was the Sachs purchasing manager responsible for acquiring the parts that would be assembled into the Nivomat shock assembly.

13. In February 2001, Jones wanted to replace one of Sachs's suppliers of Nivomat parts, a company called Taylor. Jones called Reed, whom he knew previously, and asked if she could help him locate a potential replacement for Taylor.

14. Jones explained to Reed that he was having a rift with Taylor. Taylor was having quality issues with its parts, and there was a possibility that Taylor would stop production. Although Jones needed to find a new supplier of several parts, the main part at issue was the piston nut.

15. The potential stop of production from Taylor made the need for a replacement supplier somewhat urgent. If Taylor stopped production, Sachs would need an immediate source for those parts or else face major losses.

16. Reed put Jones in touch with Madison as a potential supplier of the Taylor parts, and the two sides began discussing a possible business relationship immediately. Reed would receive a commission (approximately 3 percent) if Sachs purchased parts from Madison – i.e., three percent of gross revenue (not including payments by Sachs for tooling and machining costs).

17. Jones and Madison president Terry Sparks quickly began negotiations of a contract for Madison to produce parts, which included a tour of the Madison plant by Jones, a review of the specifications of the parts Jones wanted Madison to produce, analysis of machinery and materials, and discussion of price and production quantities.

18. One reason that Sachs was interested in Madison was the nearness of its facility to the Sachs facility in Kentucky. Sachs was also impressed with the overall quality of Madison's operation. They were an established stable business, had relevant background experience, appeared to have an extremely low incidence of returned parts, and had a good customer base with whom they had good relations, among other qualities.

19. Jones stated on a conference call (in either February or March 2001) the price and quantities that Madison had to meet to quote the piston nut business. He also said that Madison should proceed and buy the new piece of equipment that it needed to be able to produce the parts, telling them to buy what it took to give Sachs parts within the tolerances. He indicated, based on having met Sachs's pricing and other criteria, that Madison had the business.

20. It is these statements by Jones that Madison claims to be a promise upon which it detrimentally relied and for which it is entitled to an award of damages.

21. Jones also told Sparks that Madison should be capable of replacing Taylor as the supplier within 30 days after acquiring the machine. However, this "30 days" was not a literal requirement or a deal-breaking deadline but rather a figure of speech demonstrating that Sachs's need was urgent.

22. Madison did understand that it would have to submit sample and PPAP (Part Production Approval Process) parts to Sachs for approval. Sample parts are parts made and examined to show that a successful part can, in fact, be

produced. Engineers, buyers, and so forth go over the part to make sure it meets the requirements. Once these parts are satisfactory then PPAP parts are ordered. PPAP parts are produced through a typical production run, going through all of the steps at a rate and quantity in line with an actual production cycle. These parts are tested, and a report usually follows. If there are flaws, adjustments might be made in the process in an attempt to correct them. Even after approval of PPAP parts, anytime anything different is done within the plant impacting the process, such as a change in the machine making the part, a new PPAP is required. Madison had experience with the PPAP process before it ever began discussions with Sachs.

23. Madison also understood that quotes for the parts would have to be submitted and approved; that a purchase order/formal agreement would eventually need to be negotiated and signed; that Sachs did not care what specific machine or process Madison used as long as the parts were produced correctly and in the required volume; that Sachs's situation was time sensitive; and that burrs on the piston nut could break off causing problems once assembled in the Nivomat shock.

24. After the February or March 2001 conference call, Madison purchased a new machine – a Euroturn 6/32 Machining Center ("Euroturn") – to produce the piston nut cut from 12L14 steel. Madison could not produce a piston nut of this size on any of the 24 screw machines it already owned.

25. Madison considered several options for producing the piston, but settled on purchasing the Euroturn, because Madison believed it would produce an acceptable piston nut in one process.

26. Madison contacted Maxim International ("Maxim"), a distributor of Euroturn machines in the United States.

27. Maxim set up a Euroturn machine in its Dayton, Ohio facility, and ran sample piston nut parts, which were inspected by Madison's screw machine division manager, Glenn Rogers.

28. Rogers was using 12L14 steel at this point and was only making naked-eye visual inspections.

29. Maxim delivered the Euroturn to Madison on May 18, 2001.

30. Madison agreed to pay $312,500 to Maxim to purchase the Euroturn. Madison financed the entire purchase price through Wells Fargo. Additional tooling required to meet Sachs's part specifications raised the total cost.

31. Madison contends that Sachs should be liable for the price it paid to purchase the Euroturn.

32. Madison originally submitted a quote to Sachs for the piston nut under part number 1-202-100-0280.

33. Sachs and Madison later determined that the blueprint given to Madison for part number 1-202-100-0280, and for which Madison purchased tooling to produce the piston nut in the Euroturn, was obsolete.

34. Following that determination, Sachs paid Madison for the tooling Madison could not use as a result of the change in prints.

35. Sachs also issued a new request for a quote on the piston nut, assigning the part a new part number:  0041-3014-001-0.

36. Madison submitted a quote for the new part number on June 19, 2001, and thereafter submitted sample parts to Sachs.

37. Madison's first PPAP submission was unacceptable to Sachs because Madison's piston nuts had shavings on the threads.

38. Madison was notified of this on September 27, 2001, in a meeting between Madison's Celeste Reed and Jim Sparks and Sachs's Bruce Jones and Scott Miller (both purchasing agents).

39. Ultimately it was determined that these shavings were caused inadvertently by someone in Sachs's quality department.

40. Sachs and Madison agreed that Madison would submit a new sample piston nut by the first week of October.

41. The automotive industry during this time period was generally switching over to a non-lead type of steel. Madison was aware that the specifications might change, and the piston nut might have to be produced with 1215 steel (without lead) rather than the original 12L14 steel. In October Madison was quoting the piston nut with both types of steel. Sachs decided to switch to the 1215 steel.

42. In October, Madison submitted its next sample piston nuts.

43. This second sample had burrs that were not acceptable to Sachs.

44. Madison was notified of this in a November 1, 2001 meeting between Madison's Celeste Reed and Sachs's Holger Kirchner and Carole Gagliardi.

45. Kirchner found the burrs using 6x magnification; Madison had inspected only with the naked eye.

46. Madison attributes this burr problem to the change in steel. However, as Kirchner's testimony explained, it's the process, not the material, that will cause the burrs. Rogers admitted that the 12L14 nuts could have had similarly objectionable burrs.

47. The blueprints, throughout this process, consistently stated the tolerances and indicated that there could be no burrs on the outer edges.

48. After this November 1 meeting, Madison then began searching and doing testing for a secondary operation to address the burr issue.

49. A secondary operation Madison attempted, at the request of Sachs, was a thermal burn process, where the piston nuts were put inside an oven. In theory, the fire could burn off the burrs and leave the edges rounded.

50. Madison attempted a thermal burn of the piston nuts, and submitted a test sample to Sachs on January 4, 2002.

51. This process left some residual material at the location of those burrs that Sachs deemed unacceptable.

52. Madison was notified of this by e-mail to Celeste Reed on January 31, 2002.

53. After the thermal burn process test, Madison then experimented with a vibratory finishing process. During that process, the piston nuts were put into a container with different media. The container was vibrated, with the goal that the nut's surfaces would be smoothed over through contact with the other media.

54. Madison was not satisfied with the resulting quality of this test and did not submit any samples from this process to Sachs.

55. Madison next tested the use of coatings on the Euroturn keyhole cutter. Coating can be used, in some operations, on cutting tools to produce a smoother cut.

56. This process did not eliminate the burrs about which Sachs was concerned.

57. Madison next tested the use of a CNC mill that would finish the piston nut in a secondary process.

58. On April 5, 2002, Celeste Reed delivered to Sachs sample piston nuts produced using the Euroturn/CNC process.

59. Reed met with Sachs's Scott Miller and Marvin Wright (at the time, a quality engineer), who responded favorably to the samples.

60. At their April meeting, Reed, Wright, and Miller agreed that Sachs would visit Madison to observe Madison produce acceptable piston nuts.

61. Wright and Chris Noll (who had since succeeded Miller in purchasing) visited Madison on June 26, 2002.

62. At this visit, they did not observe successful production of the piston nut. Madison explained that the Euroturn was not fully operational because tooling was coming from Maxim and had yet to be installed.

63. The parties dispute whether Madison agreed to submit a good piston nut the following day or not. Madison, via Reed's, Rogers's, and Sparks's testimony, contends that this was not agreed to and was in fact not possible.

64. Noll was at first sympathetic to a minor delay due to the tooling adjustment but began looking for a new vendor within a few days following the visit when he did not hear from anyone at Madison.

65. On August 8, 2002, Reed called Noll and stated that Madison would need another four weeks before it could provide a new submission of piston nuts.

66. Finally, on August 15, 2002, Sachs's Noll and Daryl Smith called Reed to inform her that Sachs was not going to use Madison to produce any parts for Sachs.

67. Following another meeting between Sachs and Madison (either late August or early September 2002), Madison was given another chance and submitted another piston nut sample. That sample, which was submitted on November 25, 2002, had incorrect dimensions – Madison's steel supplier had a worn die – and was therefore rejected by Sachs.

68. On February 4, 2003, Madison submitted a piston nut PPAP sample that matched Sachs's specifications. On that day, Sachs's Marvin Wright signed a Part Submission Warrant for that part.

69. This successful part was accomplished with a secondary process.

70. Sachs did not ever ask Madison to begin production of the piston nut.

71. Sachs went with another supplier, D&S, for the piston nut.

72. Madison has made no effort to sell the Euroturn. It has been difficult to obtain work for the machine, but the Euroturn is presently in use by Madison for its customer YH America. This customer has created revenue for Madison. There is no evidence on which to presume that this business will not continue.

73. Madison successfully paid off its lease with Wells Fargo on the Euroturn and paid the $75,000 to keep the machine.

74. Madison has been operating at a profit from 2003 through 2006. Madison has not purchased any new screw machines with this profit. Madison's 25 screw machines seem to have sufficiently covered Madison's production needs since 2000.

75. Terry Sparks, Glenn Rogers, and Gary Russell are all salaried employees and none of their time spent on jobs for Sachs is documented.

## Conclusions of Law

This court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332. The parties agree that Indiana law governs this dispute. Madison's claim against Sachs is one of promissory estoppel. Even when an oral promise falls within the Statute of Frauds, it may still be enforced if the doctrine of promissory estoppel applies. *Brown v. Branch*, 758 N.E.2d 48, 51 (Ind. 2001). A party asserting promissory estoppel must establish five elements: (1) a promise by the promisor; (2) made with the expectation that the promisee will rely thereon; (3) which induces reasonable reliance by the promisee; (4) of a definite and substantial nature; and (5) injustice can be avoided only be enforcement of the promise. *First Nat'l Bank v. Logan Mfg. Co.*, 577 N.E.2d 949, 954 (Ind. 1991).

### No Reasonably Relied Upon Promise

The alleged "promise" at issue stems from the statements of Bruce Jones to

Madison representatives telling them that Madison would have the work and to go ahead with the purchase of a machine that could make the part. This does not constitute a legally enforceable promise. These statements merely reflected intention, optimism, or determination. It may have been reasonable for Madison to factor these statements into making some business decisions, such as investing in a piece of equipment, but giving any weight to Jones's statements was a business choice for Madison to make. Given Madison's admitted knowledge and experience, it was not reasonable to rely on this statement as any sort of legally enforceable promise. *See Garwood Packaging, Inc. v. Allen & Co.*, 378 F.3d 698 (7th Cir. 2004) (applying the Indiana promissory estoppel law in concluding that relying on the statement that a deal would go through "come hell or high water" as a promise was not reasonable); *see also Bowers v. Fed'n Internationale de l'Automobile*, 489 F.3d 316, 324 (7th Cir. 2007) (acknowledging, although in a rather factually different context, the relevance of the plaintiff's background and knowledge to realize that an event was doubtful and thus it was unreasonable to rely on the defendant's "promise").

Madison was aware of many conditions that had to be met to fully complete the deal and that any number of things could conceivably thwart the deal. Madison knew that sample parts and PPAP parts would have to be submitted and approved by Sachs – this included approval from multiple people/departments at Sachs as well as Sachs's own customers. Madison was aware that burrs had been a problem in the past and that Sachs had particular concerns. Therefore, Madison would have to prove its capabilities in that area. Madison also knew that the agreement would be reduced to writing at

some point in the form of a purchase order. At the time of the statements in question, the terms and conditions of the agreement had not been discussed. Madison also had to quote the part(s) to Sachs. The possibility always existed that Sachs could reject a quote; Sparks even acknowledged that a quote was an "offer" and that if a quote ultimately gets rejected then there would not be an agreement. Nor had specific time-lines been set for production on any of the parts. Furthermore, given the underlying pressure from the Taylor situation, Madison had to understand that this was not going to be a never-ending process and that Sachs's situation was time sensitive, increasing the pressure on all parties. Given these many conditions yet to be met and the hoops and hurdles through which to jump in this untested, budding business relationship, Madison, an experienced company, could not have interpreted Jones's generic statement that Madison should move forward in the process as a legally enforceable promise on which to rely.

Madison does point out that investing in such a pricey machine is not something Madison would do "on a dice roll." This is true; however, it was not done on just a dice roll. It was a calculated business decision. If Madison erred in its calculus regarding the stringency and intensity of Sachs's approval process, if it was overly confident and overestimated its ability to produce acceptable parts rapidly, or even if Madison erred in its understanding of the personalities with which it would need to work, it does not somehow follow that Jones's statements escalate to the level of a *reasonably* relied upon *promise*. Furthermore, Madison paid off the debt incurred with the Euroturn investment and has a profitable business. These facts cut against claiming that the

purchase was *so* extraordinary that Madison would not have undertaken the purchase without a true *guarantee* of ultimately securing Sachs's business.

Jones's statement was simply an indication that Sachs was responding favorably to Madison, after some discussions and tours of the facility, and that it wanted to proceed to the next step in the process. As long as things continued smoothly, then Sachs intended for Madison to get the work. Unfortunately, as the facts demonstrate, things did not go smoothly and the relationship fell apart. Businesses have to absorb the consequences when these things happen, and attempting to place blame now does not change the fact that Sparks understood that this was not a done deal when Jones made the statements in issue. Therefore, these statements by Jones simply do not amount to a reasonably relied upon promise.[3]

### No Injustice

Moreover, Madison suffered no "injustice [that] can be avoided only by enforcement of the promise," disqualifying its claim under the fifth promissory estoppel element. Under Indiana law the injury must be independent and constitute unjust and unconscionable injury and loss. *Brown*, 758 N.E.2d at 52, *see also Coca-Cola Co. v. Babyback's Int'l, Inc.*, 841 N.E.2d 557 (Ind. 2006). Madison invested in the Euroturn. While originally purchased with Sachs's piston nut in mind, the Euroturn's capabilities

---

[3] The defendant also puts forth other arguments discussing, for example, the terms of the purchase order and conditions precedent. These arguments appear to cut in Sachs's favor; however, a detailed analysis of these issues is simply unnecessary given the discussion and conclusion above regarding the "promise."

are not limited to making piston nuts for a Nivomat shock. It is a multi-purpose piece of equipment that is presently in use making other parts for another customer. The investment did not turn out as intended, but this is the risk any business takes when making such a purchase. A deal gone bad does not mean that the injury was "unjust" and "unconscionable." Moreover, while the loss of Sachs's business meant that Madison may not have prospered financially as it had hoped, the company is doing well. Madison has not shown any true harm resulting from its purchase of the machine. Madison paid off the debt incurred with the Euroturn investment, has obtained other work for the machine, and continues to be a successful business.

Additionally, apart from the machine, other sources of alleged loss are simply not borne out. There is no concrete evidence that Madison lost business because it would have purchased other machines instead of the Euroturn. There is also no valid claim regarding lost wages to particular employees, because they are all salaried. Even if these losses were legitimate, they would not be of the nature or magnitude rightly considered "unjust" or "unconscionable." Therefore, in addition to the absence of a reasonably relied upon promise, there is no injury of the magnitude Indiana law requires. Madison is not entitled to recovery.

## Attorney's Fees

The defendant's claim under Indiana Code § 34-52-1-1 for attorney's fees fails. Indiana Code § 34-52-1-1(b) provides:

> In any civil action, the court may award attorney's fees as part of the cost to the prevailing party, if the court finds that either party: (1) brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless; (2) continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless, or; (3) litigated the action in bad faith.

A claim is "frivolous"

> (a) if it is taken primarily for the purpose of harassing or maliciously injuring a person, or (b) if the lawyer is unable to make a good faith and rationale argument on the merits of the action, or (c) if the lawyer is unable to support the action taken by a good faith and rational argument for an extension, modification, or reversal of existing law.

*Kopa, Landau & Pinkus v. Hansen*, 874 N.E.2d 1065, 1075 (Ind. Ct. App. 2007). A claim is "unreasonable" "if, based upon a totality of the circumstances, including the law and facts known at the time of the filing, no reasonable attorney would consider that the claim or defense was worthy of litigation or justified." *Id.* at 1075. A claim is groundless "if no facts exist which support the legal claim relied on and presented by the losing party." *Id.*

Sachs argues that all three standards apply to the instant case. The court disagrees and concludes that an award of attorney's fees is not appropriate. While the facts ultimately were not in Madison's favor, the case was not of the level that no reasonable attorney would consider it worthy of litigation, or that no good faith or rational argument could be made, or that no facts existed in support of Madison's claim, etc. Madison had some facts going in its favor and made a good faith argument that those facts entitled it to a remedy. Sachs, and ultimately this court, disagreed with that conclusion; however it was not nearly as extraordinarily one-sided as Sachs suggests or as it would need to be to obtain attorney's fees.

Additionally, Madison received a favorable ruling at summary judgment. Favorable summary judgment outcomes should not be over-emphasized or relied upon as predictive of the outcome of a case at trial, but that some facts and questions existed at that stage entitling Madison to a trial further counters the notion that the case was truly frivolous, unreasonable, or groundless. Furthermore, Sachs's argument for attorney's fees is less persuasive given the last-minute nature of its introduction into the proceedings. Sachs did not raise this argument in its answer nor did it approach the subject at summary judgment. This does not necessarily waive the argument, and Sachs theoretically could recover fees from the point at which the litigation became frivolous, unreasonable, or groundless. *Kintzele v. Przyblinksi*, 670 N.E.2d 101, 103 (Ind. Ct. App. 1996) (citing *Kahn v. Cundiff*, 533 N.E.2d 164 (Ind. Ct. App. 1989) *adopted*, 543 N.E.2d 627, 629 (Ind. 1989)). However, if Sachs could not conclude at any stage prior to trial that the case was frivolous, unreasonable, or groundless, then it is difficult for the court to conclude that "no reasonable attorney would consider the claim worthy of litigation." For these reasons, Sachs's claim for attorney's fees is denied.

## Conclusion[4]

For the foregoing reasons, Madison's claim of promissory estoppel against

---

[4] The court takes this opportunity to compliment the lawyers on working together to reach so many helpful stipulations and on the prompt and efficient presentation of the evidence in this case. This trial was a model of professionalism.

Sachs fails. Sach's claim for attorney's fees also fails. Judgment will be entered accordingly.[5]

ALL OF WHICH IS ENTERED this 20th day of March 2008.

_____
John Daniel Tinder, Judge
Sitting by Designation

Copies to:

Michael R. Limrick
BINGHAM MCHALE LLP
mlimrick@binghammchale.com

Allen C. Platt III
WYATT TARRANT & COMBS LLP
aplatt@wyattfirm.com

Wayne C. Turner
BINGHAM MCHALE LLP
wturner@binghammchale.com

---

[5] This trial follows an Entry on Defendant's Motion for Summary Judgment, Doc. No. 45. In that Entry, the court determined that an oral promise was unenforceable under traditional contract theory because of the Statute of Frauds. The sole question remaining for trial was whether the Plaintiff could succeed under a promissory estoppel theory. Like the traditional contract theory of recovery, however, the promissory estoppel claim was ultimately unsuccessful. The judgment accompanying the instant Entry is final as to all claims.